[No. 45825-6-I.  Division One.  March 19, 2001.]

THE STATE OF WASHINGTON, *Respondent*, v. M.A., *Appellant*.

*James R. Dixon* (of *Nielsen, Broman & Associates, P.L.L.C.*) and *Kathryn A. Russell*, for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Daniel J. Clark, Deputy*, for respondent.

PER CURIAM — Following the juvenile court's decision declining jurisdiction, M.A. pleaded guilty in adult court to first degree assault and was sentenced to an adult standard-range sentence. M.A. committed the assault when he was 14 years old. He argues that the juvenile court erred by declining jurisdiction. Although we find that one of the court's findings entered after the decline hearing is not supported by substantial evidence, we nevertheless conclude, in light of the remaining findings, that the court did not abuse its discretion in declining jurisdiction. Accordingly, we affirm.

## FACTS

On the evening of March 27, 1999, M.A. and three other males encountered the victim riding a bicycle near a service station. At the time, M.A. was 14 years old, one of the males with him was 15 years old, and the other two were 16 years old. The victim was 16 years old.

One of the males with M.A. pulled a plastic stick from a nearby fence and struck the victim with it. The victim got off his bicycle, the two exchanged words and prepared to fight. Before the fight began, two women pulled up in a car, the victim got into the car, and the women drove off. M.A. and the three other males then began riding the victim's bicycle.

About two hours later, the victim returned to the service station in a car driven by an adult. M.A. and the three others saw the victim in the car and approached it. The adult driver left the car to use the public telephone to call the police. As the victim unsuccessfully attempted to lock the car doors, he was pulled from the car and onto the pavement. The four males then punched the victim and kicked him in the head approximately 15 times. In order to

escape before the police arrived, the three males accompanying M.A. pulled him off the victim, who was, by then, lying on the ground, bleeding and unconscious or nearly unconscious. But M.A. returned to the victim and kicked him three to five more times in the head. The victim suffered severe injuries and was taken to the hospital, where he remained in a coma and attached to a respirator for some time. Following his release from the hospital, he continued to suffer complications and adverse effects from the assault. His long-term prognosis is poor.

M.A. was charged in juvenile court with first degree assault and second degree robbery. The State asked the juvenile court to decline jurisdiction. A decline hearing was held in July 1999, after which the court entered an order declining jurisdiction. The State then charged M.A. in superior court with first degree assault. M.A. entered a guilty plea and was sentenced to 93 months in custody, the low end of the adult standard range. M.A. appeals, arguing that the juvenile court erred by declining jurisdiction.

## DISCUSSION

When the juvenile court is asked to decline jurisdiction it may, after a decline hearing, "order the case transferred for adult criminal prosecution upon a finding that the declination would be in the best interest of the juvenile or the public."[1] In determining whether to decline jurisdiction, the juvenile court must consider the *Kent v. United States* factors: (1) the seriousness of the alleged offense and whether the protection of the community requires waiver; (2) whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner; (3) whether the alleged offense was against persons or against property; (4) the prosecutive merit of the complaint; (5) the desirability of trial and disposition of the entire offense in one court when the juvenile's accomplices in the alleged offense are adults; (6) the juvenile's sophistication

---

[1] RCW 13.40.110(2).

and maturity as determined by consideration of his or her home, environmental situation, emotional attitude, and pattern of living; (7) the juvenile's record and previous history; and (8) the prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile by the use of procedures, services, and facilities available in the juvenile court.[2]

The juvenile court's decision whether to decline jurisdiction is discretionary.[3] We will reverse its decision only if, in reaching it, the court abused its discretion,[4] that is, only if the court exercised its discretion "upon a ground, or to an extent, clearly untenable or manifestly unreasonable."[5] We will not disturb the juvenile court's factual findings if they are supported by substantial evidence.[6] We examine the entire record, including the court's oral opinion, to determine the sufficiency of the court's reasons for declination.[7] Although not all eight of the *Kent* factors must be proven in order to justify declination,[8] the juvenile court's failure to give appropriate consideration to the *Kent* factors is an abuse of discretion.[9]

---

[2] The United States Supreme Court enumerated these factors in *Kent v. United States*, 383 U.S. 541, 566-67, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966). The Washington Supreme Court adopted them to govern decline hearings in Washington. *See State v. Williams*, 75 Wn.2d 604, 606-07, 453 P.2d 418 (1969); *see also State v. Furman*, 122 Wn.2d 440, 447, 858 P.2d 1092 (1993); *State v. Holland*, 98 Wn.2d 507, 515 n.2, 656 P.2d 1056 (1983); *State v. Massey*, 60 Wn. App. 131, 137 n.2, 803 P.2d 340, *review denied*, 115 Wn.2d 1021 (1990), *cert. denied*, 499 U.S. 960 (1991). The *Holland* court quoted the factors verbatim from the *Kent* opinion. Other Washington courts have paraphrased the factors. The slight differences among the paraphrased versions are of no significance except with respect to M.A.'s argument regarding the seventh factor, discussed below.

[3] *State v. Stevenson*, 55 Wn. App. 725, 735, 780 P.2d 873 (1989), *review denied*, 113 Wn.2d 1040 (1990).

[4] *Furman*, 122 Wn.2d at 447.

[5] *State v. Toomey*, 38 Wn. App. 831, 834, 690 P.2d 1175 (1984), *review denied*, 103 Wn.2d 1012, *cert. denied*, 471 U.S. 1067 (1985).

[6] *Stevenson*, 55 Wn. App. at 736.

[7] *Holland*, 98 Wn.2d at 518.

[8] *Furman*, 122 Wn.2d at 447.

[9] *Stevenson*, 55 Wn. App. at 736; *Toomey*, 38 Wn. App. at 834.

In considering the seriousness of the offense and protection of the community, the juvenile court found "no question" that the seriousness of the assault supported declination, and characterized the assault as one of the "cruelest attacks" the court had seen. Indeed, M.A. concedes that there is "no doubt" that the assault as alleged in the information was serious. He argues that this factor cannot, standing alone, support declination because it will be present whenever first degree assault charges are filed. But this factor is not the only one supporting declination, so this argument is of no moment. Moreover, we agree with the trial court that the assault as alleged, which resulted in severe, life-threatening, and permanently debilitating injuries to the victim, exhibited extreme cruelty and was indeed gravely serious. Substantial evidence supports the court's finding that the seriousness of the offense weighs in favor of declination.

M.A. argues that the juvenile court failed to consider the "protection of the community" portion of the first *Kent* factor. While the court's written finding does not mention it, the court did include it in its oral opinion. Moreover, substantial evidence supports the finding that the protection of the community weighs in favor of declination.

The trial court found that the second *Kent* factor, the degree of premeditation, willfulness, violence, and aggression involved in the alleged offense, supported declination. M.A. argues that the trial court unduly focused on this factor and erroneously found that it weighed in favor of declination. According to M.A., the very nature of first degree assault is that of a violent crime, and so in virtually every case in which a juvenile is charged with first degree assault, this factor will be satisfied.

We disagree. First, contrary to M.A.'s assertion, not every first degree assault involves inflicting injuries with the degree of violence and aggression with which M.A. assaulted his victim.[10] Second, here the juvenile court focused

---

[10] For example, first degree assault can be committed by the exposure, with

on evidence of M.A.'s actions during the assault, such as his pulling the victim from the vehicle and returning to the helpless victim to inflict additional kicks to the head after the others pulled him away. Also, the court found, in an unchallenged finding, that M.A. boasted about the number of blows he inflicted and that, by his own admission, M.A. was the most brutal and aggressive of the four attackers. Substantial evidence supports the court's finding that the manner in which this crime was alleged to have occurred weighs in favor of declination.

M.A. does not dispute the lower court's finding as to the third *Kent* factor, namely that the offense was against a person. Likewise, he does not dispute the lower court's finding as to the fourth *Kent* factor, namely that the complaint had prosecutive merit.

■ The lower court found that the fifth *Kent* factor, the desirability of trial and disposition of the entire offense in one court, weighed neither in favor of nor against declination and accordingly gave no weight to the factor. M.A. argues that in light of this finding, the court erred by checking off the line containing this factor on the preprinted form entitled "Hearing, Findings and Order on Decline of Jurisdiction."

Any error on the form was harmless. The Washington Supreme Court has criticized using standardized forms and boilerplate language as a substitute for detailed, case-specific findings regarding the *Kent* factors.[11] But where the boilerplate findings are inadequate, the reviewing court may look to the entire record, including the court's oral opinion, to analyze the decision.[12] Here, the lower court not only gave an extensive oral opinion but also entered detailed findings of fact. These materials permit meaningful appellate review of the court's decision to decline jurisdic-

---

intent to inflict great bodily harm, of another to a poison, HIV, or another destructive or noxious substance. RCW 9A.36.011(1)(b).

[11] *Holland*, 98 Wn.2d at 517.

[12] *Id.* at 518.

tion without considering the standardized form. It is clear from both the oral opinion and the written findings that the court gave no weight to the fifth *Kent* factor. Any error on the standardized form is therefore harmless.[13]

The court found that the sixth *Kent* factor, M.A.'s sophistication and maturity determined by consideration of his home, environmental situation, emotional attitude, and pattern of living, also supported the decline.[14] M.A. argues that the bases for the court's finding either are not relevant to whether he is sophisticated or mature or show that he was, in fact, immature and unsophisticated.

The probation counselor's report reveals that M.A. had been living with his foster mother and two of the three other males involved in the assault. In prior living situations, M.A. had been abused and neglected. He resisted therapy and refused to perform community service as required under a prior probation. M.A. told his probation counselor that he started smoking marijuana when he was nine years old, and smoked it four or five times a day. He drank alcohol about once a week and drank enough to get drunk. The counselor noted that M.A. has emotional and psychological issues, anger management problems, and poor verbal skills.

Dr. Gerald Fleischer, a clinical psychologist who exam-

---

[13] "A harmless error is one which is trivial, formal, or merely academic and which in no way affects the outcome of the case." *State v. Gonzales*, 90 Wn. App. 852, 855, 954 P.2d 360, *review denied*, 136 Wn.2d 1024 (1998).

[14] The court found:

[M.A.]'s criminal history is disturbing because it does include history with the court. [M.A.]'s first diversion has a frightening similarity in the fact pattern to the incident at issue: [M.A.] went up behind a boy and hit the boy to the ground; [M.A.] then continued to kick that boy in the head and chest. Thankfully a passerby came to that boy's help.

There is no question that [M.A.] has had a difficult childhood. [M.A.] remains angry and aggressive; he does not appear interested in taking advantage of the many services available through the Department of Youth Services and Probation. [M.A.] has had two diversions; he has been on probation.

By all accounts, [M.A.] is physically very mature. [M.A.] has spent much of his youth with older adults. Additionally, [M.A.]'s educational background includes multiple suspensions for aggressive behavior.

ined M.A. on referral from a probation counselor, concluded that although M.A. is physically mature for his age, "he also appears to be a depressed child, with a history of rejection, abuse, and abandonment."

■ Dr. Thomas Newlyn, who also examined M.A., concluded that although M.A.'s "developmental age is congruent with his biological age of 14 years, he is socially immature and has poor verbal skills. It is my psychiatric assessment that [M.A.] has a conduct disorder and chemical dependency problem."

We cannot say that the trial court's finding on this factor is supported by substantial evidence. The evidence about M.A.'s home and environmental situations, emotional attitude, and pattern of living does not reflect sophistication or maturity. Unlike, for example, the juvenile defendant in *State v. Toomey*,[15] whom the court found to be sophisticated and mature, there is no evidence to suggest that M.A. was living on his own or was particularly streetwise. The facts in this finding about M.A.'s prior diversions and probation more properly relate to the next *Kent* factor, his criminal record and history, not his degree of sophistication or maturity. Neither M.A.'s physical maturity nor his suspensions from school compel a finding that he is emotionally mature. In sum, we conclude that the court's finding as to the sixth *Kent* factor is not supported by substantial evidence. But this does not compel the conclusion that the decline was erroneous because, as stated above, not all eight of the *Kent* factors need be present. We therefore continue our analysis under *Kent*.

■ With respect to the seventh *Kent* factor, the court found that M.A.'s criminal history weighs in favor of declination. The court considered two prior adjudications, two prior diversions, and three prior referrals. M.A. argues that the court should have considered only the two adjudications, relying on the definition of "criminal history" in the Juvenile Justice Act of 1977. Under the Act, criminal

---

[15] 38 Wn. App. 831, 835, 690 P.2d 1175 (1984), *review denied*, 103 Wn.2d 1012, *cert. denied*, 471 U.S. 1067 (1985).

history includes only criminal complaints in which a court found the allegations were correct prior to the current case or deferred cases entered after July 1, 1998.[16] M.A. cites no authority for the proposition that this definition should be used in analyzing the *Kent* factors. Indeed, the *Kent* Court itself did not use the term "criminal history" but rather used the term "record and previous history."[17] The Washington Supreme Court quoted that same language when listing the *Kent* factors.[18] Later Washington cases have also used the phrase "record and previous history."[19]

We do not agree with M.A.'s argument that to allow a court to consider, as here, diversions and referrals in analyzing the seventh *Kent* factor would deny a juvenile due process of law. The issue in the case upon which he relies, *State v. Melton*,[20] was whether a juvenile court could use pending charges as an aggravating factor in sentencing. Deciding the proper sentence in a juvenile proceeding is very different from determining whether to decline jurisdiction. Unlike a determination of delinquency or guilt, a determination of whether to decline jurisdiction does not directly result in confinement or other punishment, and a decline hearing is not, therefore, an adversarial proceeding.[21] Rather, the sole purpose of a decline hearing " 'is to determine "whether best interests of the child and of society would be served by the retention of the juvenile court authority over him or whether the juvenile, under all the

---

[16] RCW 13.40.020(7).

[17] *Kent*, 383 U.S. at 567.

[18] *Holland*, 98 Wn.2d at 515 n.2.

[19] *See Massey*, 60 Wn. App. at 137 n.2; *Toomey*, 38 Wn. App. at 835. In other cases, courts have paraphrased this factor. For example, in *Furman*, the court identified the seventh factor as "the juvenile's criminal history." 122 Wn.2d at 447. Despite the *Furman* court's use of the phrase "criminal history," we find no support for M.A.'s argument that this factor was meant to confine a juvenile court to consideration of "criminal history" as that term is defined in the Juvenile Justice Act of 1977.

[20] 63 Wn. App. 63, 72, 817 P.2d 413 (1991), *review denied*, 118 Wn.2d 1016 (1992).

[21] *In re Welfare of Harbert*, 85 Wn.2d 719, 725, 538 P.2d 1212 (1975).

circumstances, should be transferred to be tried as an adult." ' "[22] In a decline proceeding, the court must focus on the actor, not the act, and must consider the juvenile's past, future, state of mind, and actions and then balance these factors against the safety, needs, and demands of society.[23] To effectively undertake the analysis, the juvenile court must consider the juvenile's prior diversions and referrals as well as his or her prior adjudications. Here, the juvenile court did not err in considering M.A.'s entire prior history and in noting the disturbing similarity between the fact pattern of the first degree assault at issue and one of the prior diversions. The court's finding that the seventh *Kent* factor weighs in favor of declination is supported by substantial evidence.

The eighth and final *Kent* factor requires the court to consider the prospects for adequately protecting the public and rehabilitating the juvenile through services available in the juvenile system. M.A. argues that the court erred by considering only the protection of the community prong of the eighth *Kent* factor and failing to consider the prospects for his rehabilitation. We disagree.

In its written finding, the court noted the differences between the adult and juvenile standard ranges for first degree assault and found that the community would be protected for a longer time if M.A. were tried in the adult system. In its oral opinion, the court noted that the longer confinement under the adult system would also allow M.A. greater access to programs designed to address the issues identified by the various professionals who examined him. Thus, a review of the court's written findings and oral opinion, which is proper on appeal,[24] establishes that the court did consider both parts of the factor. Substantial evidence supports the trial court's finding that the eighth *Kent* factor weighs in favor of declining jurisdiction. More-

---

[22] *Id.* (quoting *State v. Piche*, 74 Wn.2d 9, 14, 442 P.2d 632 (1968) (quoting *Sheppard v. Rhay*, 73 Wn.2d 734, 738, 440 P.2d 422 (1968))).

[23] *Id.* at 726 (citing *Miller v. Quatsoe*, 332 F. Supp. 1269, 1275 (E.D. Wis. 1971)).

[24] *Holland*, 98 Wn.2d at 518.

over, contrary to M.A.'s argument, the juvenile court is not required to balance the two parts of the eighth factor. While it must consider both, "the public interest alone clearly permits declination under the language of RCW 13-.40.110."[25]

We agree with the trial court's conclusion that the prospects for M.A.'s rehabilitation will be greater in the adult system because the juvenile justice system has simply been ineffective in helping him. Before this assault, M.A. had numerous encounters with the juvenile criminal justice system. None of the attempts at treatment was successful, largely because of M.A.'s apathetic attitude and his refusal to attend sessions and participate in treatment. His foster mother reported that he was not afraid of probation or of the prospect of detention and continued to violate his probation because he believed that the sole consequence in juvenile court would be a mere "slap on the wrist." His behavior was also shaped by his knowledge that his juvenile criminal history "would disappear" when he turned 18, and the juvenile court would no longer have any authority over him. His friends reinforced M.A.'s belief that offenses committed while a juvenile would have little or no consequences. They assured him that neither the court nor his guardian could do more than use words to enforce rules because of a "no spanking law." Thus, the record shows that the juvenile system was ineffective at deterring M.A.'s criminal behavior and at addressing, let alone remedying, his clearly identified problems with social skills and anger management. Given this evidence, the court reasonably concluded that if M.A. were in custody for a longer period, as would be the case under the adult system, his prospects for rehabilitation would be increased. We will not disturb the court's finding that the eighth *Kent* factor weighed in favor of declination.

In sum, the juvenile court did not abuse its discretion in declining jurisdiction under RCW 13.40.110. Because we

[25] *Toomey*, 38 Wn. App. at 836 n.4.

affirm the trial court's exercise of discretion in declining jurisdiction based on the *Kent* factors, we do not address the propriety of the court's consideration of the "other factors" M.A. alleges the court improperly considered.

Affirmed.